FILED
2012 May-22  PM 09:05
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **EDWARD R. LANE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:11-cv-00883-KOB** |
| | ) | |
| **CENTRAL ALABAMA** | ) | |
| **COMMUNITY COLLEGE, and** | ) | |
| **DR. STEVE FRANKS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Plaintiff, Edward R. Lane, by and through his attorneys of record, and respectfully submits this brief in opposition to Defendants' Motion for Summary Judgment.  Genuine issues of material fact exist, and Defendants are not entitled to judgment as a matter of law.

# TABLE OF CONTENTS

**Table of Contents**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

**Statement of Facts**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

**Standard of Review**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

**Argument**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

    **A.**    **Plaintiff's §1983 First Amendment Retaliation Claim**. . . . . . .  24

        1.    <u>Defendant Franks is not immune from suit in his official or individual capacity</u>. . . . . . . . . . . . . . . . . . . . . .  24

        2.    <u>Plaintiff's speech was protected by the First Amendment</u>. . . .  27

        3.    <u>Defendants were motivated to terminate Plaintiff because of his protected speech</u>. . . . . . . . . . . . . . . . . . . . .  32

        4.    <u>A jury could reasonably find that Lane would not have been terminated absent his protected speech</u>. . . . . . . . . . . . .  36

        5.    <u>Defendant Franks is not entitled to qualified immunity</u>. . . . .  40

    **B.**    **Plaintiff's State Claim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

    **C.**    **Plaintiff Is Entitled To Compensatory Damages Beyond 2009** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

## I. STATEMENT OF FACTS

### A.    Response to Movants' Statement of Facts[1]

1.    Admitted, but with clarification. Because Plaintiff timely filed his action, he disputes that the statute of limitations is a relevant, material fact for purposes of this motion. (*See* Doc. 9, Order denying Defendants' motion to dismiss.)

2.    Admitted, but with clarification. Plaintiff voluntarily dismissed his count alleging conspiracy. (Doc. 14, Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Amended Conspiracy Count.)

11.    Disputed in part. Lane testified that he doubted whether Byrne was motivated by a desire to rid the two-year system of scandal. (Lane Dep. at 221:10-222:2.)

18.    Disputed. Lane's testimony was not "in his capacity" as Schmitz' former boss. Lane was not even employed by CACC during Schmitz' second trial. (Lane Dep. at 187:22-188:23, 189:6-7, 190:5-15, 191:3-7, 182:15-193:2.) There is no evidence in the record that Lane's job description or job duties included testifying at criminal proceedings. Furthermore, Lane testified to matters in addition to his supervision of Schmitz as his employee. For example, on August 26, 2008, Lane

---

[1] Consistent with Appendix II, Plaintiff has only responded herein to those numbered paragraphs which he disputes.

1

testified that Schmitz acquired her job by making arrangements with Mr. Ed Earnest, the previous director, Roy Johnson, a previous Chancellor, and Dr. Paul R. Hubbert, Executive Secretary of the Alabama Education Association. (Ex. 2 at 179, 202.)

21.    Disputed and immaterial. (Lane Dep. at 105:13-106:11, 107:9-15, 109:9-110:5; Ex. 2 at 109-10.)

25.    Disputed. Funds were available through Lane's successful efforts to control expenditures at C.I.T.Y. Programs. (Lane Dep. at 86-88.)

26.    Disputed. Funds were available through Lane's successful efforts to control expenditures at C.I.T.Y. Programs. (Lane Dep. at 86-88.)

39.    Disputed. Franks was not motivated by a financial decision to enact a reduction in force. At his deposition, Lane testified that the totality of the situation and Dr. Franks' actions lead him to believe that he was actually being retaliated against for his testimony at Schmitz' trial. (Lane Dep. at 201:3-202:18, 220:13-221:9, 231:1-8, 236:11-21.)

40.    Disputed. Plaintiff disputes that Franks believed that all 28 employees terminated in the reduction in force (before the rescission of 26 of the terminations) were probationary when Franks enacted the reduction in force. Furthermore, Franks testified at his deposition that 26 of the 28 terminated employees were not probationary, hence the rescission of their termination. (Franks Dep. at 47-50, 88-89,

92; Pl.'s Ex. 2 to Franks Dep.; Ex 6.)

47.    Disputed in part. This takes liberties with the record. Nowhere in the record has Frank stated when he made the decision to rescind terminations, whether before or after he originally terminated the employees. "On or around January 23" is an inference drawn by Defendants. For purposes of summary judgment, all inferences should be drawn in favor of the non-movant, Plaintiff.

50.    Disputed in part. "At least one other employee" is a distortion of the record. Defendants have admitted in their interrogatory responses that Lane and **one** other were the only employees fired in January, 2009 who did not have their employment restored. (Ex. 7 at 7-9.)

51.    Disputed. With inferences drawn in favor of Plaintiff, Franks did not reasonably believe that Lane's probationary period was less ambiguous than that of the reinstated employees.   (Franks Dep. at 88-102; Ex. 6.) Furthermore, with inferences drawn in favor of Plaintiff, Franks did not rescind Lane's termination because Franks possessed a retaliatory motivation, not a belief that Lane had a three-year probationary period. (*See also* Additional Undisputed Facts, ¶¶ 80-92, *infra*.)

52.    Disputed. Citations to Franks' declaration are testimony about his mind set that is disputed by Plaintiff's other evidence. (Franks Dep. at 88-102; Ex. 6; *see also* Additional Undisputed Facts, ¶¶ 80-92, *infra*.)

53.     Disputed. Citations to Franks' declaration are testimony about his mind set that is disputed by Plaintiff's other evidence. (Franks Dep. at 88-102; Ex. 6; *see also* Additional Undisputed Facts, ¶¶ 80-92, *infra*.)

54.     Disputed. Citations to Franks' declaration are testimony about his mind set that is disputed by Plaintiff's other evidence. (Franks Dep. at 88-102; Ex. 6; *see also* Additional Undisputed Facts, ¶¶ 80-92, *infra*.)

55.     Admitted, but with clarification. Plaintiff is not limited to the allegations in his complaint.

57.     Disputed. These questions asked by Defendants' counsel came at the end of Lane's deposition without factual context. (Lane Dep. at 230-31.) Earlier in his deposition, Lane testified clearly that the timing of his termination by Dr. Franks was very suspicious – right around the time that the budget process was just beginning to start in the legislature. (Lane Dep. at 201:3-202:18.) Lane had already testified that the totality of the situation and Dr. Franks' actions lead him to believe that he was being retaliated against for his testimony at the Schmitz trial by Dr. Franks. (Lane Dep. at 201:3-202:18, 220:13-221:9, 231:1-8, 236:11-21.)

59.     Disputed. (Franks Dep. at 41:16-42, 90:4-17; Ex. 7 at 11.)

60.     Admitted, but with clarification. The question asked of Mr. Lane was with specific reference to the **date** of February 18, 2009, not as to whether Lane

4

would testify again. (Lane Dep. at 190.)

68.     Disputed. Defendant Franks was aware of the Sue Schmitz prosecutions as a result of reporting in the newspaper. (Franks Dep. at 38:15-39:5, 41:12-15, 43-44.)

69.     Admitted, but with clarification. Plaintiff is not limited to the allegations in his complaint.

70.     Admitted, but with clarification. Plaintiff is not limited to the allegations in his complaint.

71.     Admitted, but with clarification. Plaintiff is not limited to the allegations in his complaint.

72.     Disputed. Plaintiff is not limited to the allegations in his complaint. A jury could easily infer that Paul Hubbert instructed or suggested that Franks should terminate Lane, despite the self-serving statements made in Defendant Franks' deposition and later declaration. (Franks Dep. at 23-25; Ex. 3 at 392-93, 422-23; Ex. 2 at 179, 183-84; Ex. 4 at 1247-50; Schmitz Dep. at 26:19-27:18.)

75.     Disputed. Franks admitted at his deposition that he met Schmitz shortly after returning to Alabama, and at a legislative session. (Franks Dep. at 37:13-21.)

**B.**     <u>**Plaintiff's Statement of Additional Undisputed Facts**</u>

**Sue Schmitz Is Hired To Work At C.I.T.Y. Programs**

1.     On August 25, 2008, Charles Foley testified at the Schmitz trial that he was given a directive by Mr. Earnest to put Sue Schmitz in an office at C.I.T.Y. He was told that "she would never interfere with the ongoings" of the program. (Ex. 1 at 144-45.)

2.     Charles Foley testified at trial that hiring a state legislator was an asset to C.I.T.Y. Programs because it helped get funding for the program. (Ex. 1 at 144, 157:20-25.)

3.     Larry Palmer testified at the Schmitz trial that the hiring of a legislator, Sue Schmitz, would help ensure the funding of the C.I.T.Y. Programs in the legislature. (Ex. 3 at 397.)

4.     Larry Palmer testified at trial that Schmitz acquired her job through the influence of Roy Johnson and Dr. Paul Hubbert, Executive Secretary of the Alabama Education Association. Palmer also testified that Mr. Earnest told him that Earnest could not avoid hiring Schmitz, even though he did not like the situation and did not want to do it. (Ex. 3 at 392-93.)

5.     Lane also testified at trial that Schmitz got her job through Paul Hubbert. (Ex. 4 at 1247.)

6.      Schmitz admitted at her deposition that Hubbert had helped her secure her job at C.I.T.Y. Programs. (Schmitz Dep. at 18-19, 42.)

7.      Larry Palmer testified at trial that Sue Schmitz once cc'd Paul Hubbert and Roy Johnson on correspondence she sent Foley in an effort to intimidate him. He also testified that he perceived her actions to have the intent of a threat. (Ex. 3 at 422-23.)

8.      Larry Palmer testified that he did not evaluate Sue Schmitz because, even though he was displeased with her performance, he did not want to put that in writing for fear that it would affect the budget given to C.I.T.Y. Programs. He testified that he treaded lightly around Sue Schmitz because he did not want her to create problems for the program. (Ex. 3 at 543.)

9.      At his deposition, Lane testified that others in C.I.T.Y. Programs had been afraid to question Sue Schmitz' employment because they were afraid of losing funding in the legislature. (Lane Dep. at 196:3-16.)

**Plaintiff Lane Is Hired As C.I.T.Y. Programs Director**

10.     Lane was hired as director of C.I.T.Y. Programs on September 26, 2006. (Ex. 2 at 171:1-8.)

11.     When CACC hired Lane as director of C.I.T.Y. Programs, C.I.T.Y. was experiencing significant financial problems. (Lane Dep. at 58:16-23.)

7

12.     When Lane was hired, he was told that two C.I.T.Y. facilities were scheduled to close, and that if he was not able to save the facilities, it would not be held against him. (Lane Dep. at 58:16-23, 85.)

13.     When Lane was hired, Linda McGuirt, the acting president of CACC, informed Lane that she acted as his supervisor. (Lane Dep. at 47:15-17, 60:5-61:7.)

14.     In the last fiscal year that C.I.T.Y. Programs was directed by Edward Lane, the program registered some of the highest student success rates in its history. (Ex. 4 at 1254:16-22.)

15.     Lane made considerable effort to save the programs that were scheduled to close by looking for places where cuts could be made. (Lane Dep. at 86-88.)

16.     Lane's efforts allowed him to save the endangered programs in Mobile and Montgomery that had been successful in the communities where they operated yet were scheduled to close due to budgetary concerns. (Lane Dep. at 86, 90:11-91:3.)

17.     While Lane had been told that an inability to save the endangered programs would not have been held against him, his successful efforts to save the programs were considered a significant accomplishment that pleased the CACC board of directors (before Franks was hired by CACC). (Lane Dep. at 90:11-91:3, 91:14-92:18.)

**Lane Terminates Sue Schmitz' Employment**

8

18.     After beginning his job as C.I.T.Y. Programs Director, Lane became aware through the news media of the ongoing investigations into the two-year college system. (Lane Dep. at 166:11-22; Ex. 2 at 143:21-144:4.)

19.     As a result of his concerns about C.I.T.Y. Programs' tight budget, the two-year college investigations, and the suggestions of John Caylor (attorney for CACC), Lane decided he should investigate Sue Schmitz' job description and performance at C.I.T.Y. Programs. (Lane Dep. at 166:11-22, 170:4-171:12.)

20.     Lane was warned, however, by John Caylor that taking actions against Sue Schmitz could result in bad repercussions for both Lane and C.I.T.Y. Programs generally. (Lane Dep. at 197:1-11.)

21.     Before Lane terminated Sue Schmitz, he and John Caylor approached Ms. McGuirt to inform her that Lane was preparing to terminate Schmitz. (Lane Dep. at 15-21.)

22.     At that meeting, Ms. McGuirt asked Lane if he was sure that he wanted to go through with that action. McGuirt also warned Lane that his proposed actions could bring him problems. (Lane Dep. at 186:1-12.)

23.     McGuirt told Lane specifically: "I would be very careful if I was you in that situation." (Ex. 4 at 1248:11-14.)

**Sue Schmitz Resents Her Termination By Lane**

9

24.     After the meeting when Mr. Lane terminated Schmitz, Schmitz and Mary Bruce Ogles, an AEA executive, stepped outside. A phone call was made to Dr. Paul Hubbert on behalf of Sue Schmitz. (Schmitz Dep. at 26:19-27:18.)

25.     After her termination by Lane, Schmitz commenced a civil lawsuit to get her job back at C.I.T.Y. Programs. (Lane Dep. at 239:3-17; Schmitz Dep. at 22-23.)

26.     Charles Foley testified at trial that he met with Schmitz at a Cracker Barrel after she was terminated by Lane. At the Cracker Barrel meeting, Sue Schmitz was very angry at Edward Lane and she made statements that she was going to "get him back." (Ex. 1 at 173-74.)

27.     Sue Schmitz said that if Edward Lane ever comes down to Montgomery requesting money for the C.I.T.Y. Programs, she was going to tell him "You're Fired." (Ex. 1 at 174.)

28.     Sue Schmitz admitted under oath, at her second trial on February 20, 2009, that she did, in fact, tell Charles Foley that if she ever had the opportunity to talk to Edward Lane again she would tell him he's fired. She testified at trial that she made those statements about Lane because she was so hurt by being fired by him. (Ex. 5 at 319:13-19.)

29.     At her deposition, however, Schmitz testified that she did not recall telling Foley anything about wanting to tell Lane he was fired. (Schmitz Dep. at 40.)

10

30.    At her deposition, Schmitz testified that she was not sure how she learned that Edward Lane had been terminated. When pressed, Schmitz thought maybe her husband read it in the paper. (Schmitz Dep. at 41.)

31.    Schmitz also testified at her deposition that hearing the news of Lane's termination did not produce an emotional reaction, and that she feels for anyone who loses a job. (Schmitz Dep. at 41.)

**Sue Schmitz Is Prosecuted And Lane Testifies**

32.    After Lane terminated Sue Schmitz, the FBI began investigating C.I.T.Y. Programs and Sue Schmitz. (Lane Dep. at 172:1-11, 180:20-181:2.)

33.    In late 2007, Lane testified at a grand jury proceeding that lead to Federal criminal charges against Sue Schmitz. (Lane Dep. at 181:22-182:11.)

34.    On November 13, 2006, at the grand jury proceeding, Mr. Lane testified to the same things that he later testified to at trial on August 26, 2008, including the lack of work performed by Schmitz at C.I.T.Y. Programs and how Schmitz acquired her job at C.I.T.Y. Programs. (Ex. 2 at 202.)

35.    Lane testified at Sue Schmitz' first criminal trial on August 26, 2008. Lane was the government's final witness before it rested its principal case against Sue Schmitz. (Ex. 2 at 170-201, 203.)

36.    On August 26, 2008, Lane testified about conversations he held with Mr.

11

Foley regarding whether Schmitz was reporting for work. (Ex. 2 at 173-76.)

37.     On August 26, 2008, Lane testified about conversations he had with Schmitz herself regarding his concerns about her lack of work for C.I.T.Y. Programs. (Ex. 2 at 177-79.)

38.     On August 26, 2008, Lane testified that Schmitz acquired her job by making arrangements with Mr. Earnest, the previous director, Roy Johnson, a previous Chancellor, and Dr. Paul Hubbert of AEA. (Ex. 2 at 179.)

39.     Schmitz testified that she often saw Roy Johnson in the halls of the legislature. (Ex. 5 at 182:13-19.)

40.     On August 26, 2008, Lane testified that he believed Schmitz had tried to name drop to prevent him from inquiring about her duties and responsibilities at C.I.T.Y.  Programs. (Ex. 2 at 179-80.)

41.     On August 26, 2008, Lane testified that he did not see any work product provided by Sue Schmitz to the C.I.T.Y. Programs. (Ex. 2 at 187.)

42.     On August 26, 2008, Lane testified that he had also testified at Schmitz' prior grand jury proceeding on November 13, 2006. (Ex. 2 at 201.)

43.     On August 26, 2008, Lane testified that when he pressed Schmitz about the issue of her needing to report to the Huntsville office, she responded by saying "Well, I guess I just need to call Mr. Hubbert." (Ex. 2 at 183-84.)

12

44.    In 2009, Lane again testified that when he first tried to make Sue Schmitz show up for work in Huntsville, she responded that she was going to call Paul Hubbert. (Ex. 4 at 1250.)

45.    At her deposition, Schmitz was unable to recall anything that Mr. Lane testified to at her first trial, except that Lane testified she worked for him. (Schmitz Dep. at 35-36.)

**C.I.T.Y. Program's Funding Is Endangered**

46.    In 2008, the C.I.T.Y. Programs' funding was endangered by the poor economy and the resulting prorated cuts of its budget. (Lane Dep. at 72:19-73:8, 111:22-112:14, 147:22-148:12.)

47.    C.I.T.Y. Programs applied for Federal grants, but did not receive any. (Lane Dep. at 107:9-15, 105:10-15, 109:9-110:5.)

48.    The two year college system also had a department that received Federal grants and was responsible for the distribution of grants to CACC's programs. C.I.T.Y. Programs would request these grants under Lane's direction. (Lane Dep. at 105:13-106:11, 107:9-15; Ex. 2 at 109-10.)

49.    As a result of funding concerns, Lane initiated discussions with Dr. Price about the possibility of implementing a reduction in force as a last resort to address C.I.T.Y. Program's budgetary problems. (Lane Dep. at 72:19-73:8, 114:22-115:5,

13

118:20-119:17.)

**Defendant Franks Is Hired And Lane Is Terminated**

50.     Defendant Franks was born in Alabama (Franks Dep. at 6:23), graduated from the University of Alabama (Franks Dep. at 14), served in the Alabama National Guard (Franks Dep. at 9:12), and worked at the Alabama Department of Education from 1988 to 1996 before he moved to Arkansas (Franks Dep. at 17).

51.     Defendant Franks had known at least one legislator, Betty Carol Graham, before moving to Arkansas. (Franks Dep. at 54.)

52.     Defendant Franks was hired in late 2008 as CACC's President. (Lane Dep. at 70:22-71:3, 81.)

53.     Defendant Franks testified at his deposition that he met Sue Schmitz at a legislative session shortly after he returned to the state from Arkansas. (Franks Dep. at 37:13-21.)

54.     At her own deposition, however, Schmitz did not remember ever meeting Dr. Franks, or ever having any dealings or communications with him. (Schmitz. Dep. at 15-17, 51.)

55.     Lane sent letters to Dr. Franks about proposed reductions in force as a method of addressing C.I.T.Y.'s budgetary problems. (Lane Dep. at 148:16-149:6; Franks Dep. at 21:1-8.)

14

56.     Without discussing the timing of implementing a reduction in force with Lane, Dr. Franks terminated Lane, the director of C.I.T.Y. Programs, through a reduction in force. Lane was left out of the decision making of this process, despite his earlier suggestions of a "RIF" as a possible solution to the budget problems. (Lane Dep. at 119:19-120:10, 125:21-126:21.)

57.     Defendant Franks terminated Plaintiff Lane in January of 2009, shortly after being hired as CACC President. (Lane Dep. at 70:22-71:3.)

58.     On January 26, 2012, when Franks terminated Lane, Lane was not given a reason for his termination – Lane was told only that he should clean out his office. He testified as follows at Schmitz' second trial, shortly after his termination:

> Q      Could you tell us how you are currently employed?
> A      I am not at this time.
> Q      All right. What was the last job that you had?
> A      I was the director of C.I.T.Y. Programs.
> Q      And how long did you have that job?
> A      Approximately two years and -- two and a half years.
> Q      When did you start working as the director of the C.I.T.Y. Program?
> A      In September of 2006.
> Q      And when did you stop working as the director of the C.I.T.Y. Program?
> A      In January of this year.
> Q      All right. When did you stop working as the director of the C.I.T.Y. Program?
> A      In January 6 of this year, I received a letter from Dr. Franks, Steve Franks, who was the current president of Central Alabama Community College. He had contacted me about meeting me at my office in Talladega to talk

15

> with me. When I got there that morning, he presented me
> with a letter telling me that my services were no longer
> needed and for me to clean out my office and to leave.
>
> Q    Were you terminated for some violation of your duties or
> for some reason?
>
> A    Excuse me. (Witness taking a drink of water.) Let me get
> myself together because this is a little difficult.
>
> Q    Take all the time you need, Mr. Lane.
>
> A    They have not given me a reason for my termination; they
> just told me to clean out my office.

(Ex. 4. at 1241-42.)

59.    Lane had virtually no contact with Dr. Franks before he was terminated

by Dr. Franks. (Lane Dep. at 126:18-127:5.)

60.    Defendant Franks testified that he did not think Lane was planning on

being a part of the reduction when he recommended a reduction in force. (Franks

Dep. at 64:10-12.)

**Lane's Termination Is Not Rescinded Like Other C.I.T.Y. Employees**

61.    Defendant Franks sent out termination letters on January 9, 2008 to 28

employees, including Lane, whom Franks now claims he considered to be

probationary – with the exception of Lane and one other employee. (Franks Dep. at

92; Ex. 7 at 8-9.)

62.    Defendant Franks sent recision letters, however, to 26 of these 28

employees on January 29, 2008, 20 days after their termination. (Franks Dep. at 92.)

63.    All of the RIF-terminated employees, except for Lane and one other low-

level employee (who had been working at C.I.T.Y. less than six months), were brought back and had their employment reinstated. (Lane Dep. at 122:10-21; Franks Decl. at ¶ 8.)

64.     Dr. Franks testified at his deposition that he rescinded the terminations of all the employees, except for Lane and one other, because there was too much "gray area" about whether they were probationary employees or not. (Franks Dep. at 69-70, 84:7-19.)

**Franks and CACC Claim Lane Was Terminated For "Financial Reasons"**

65.     Franks testified at his deposition that the reason he fired Lane was that it was a "Financial decision":

> Q.     Okay. Why was Edward Lane terminated?
> A.     Financial decision.
> Q.     What does that mean?
> A.     They couldn't make payroll.
> Q.     Well, if an entity can't make payroll, does it make sense to eliminate the person at the head of it?
> A.     Well, he was a probationary employee and obviously the highest paid employee in the program.
> Q.     Well, if you eliminate the director, the program was still going on at the time, wasn't it?
> A.     Correct.
> Q.     Who was going to run it?
> A.     I named the interim director, another staff person.
> Q.     Who was that?
> A.     Larry Palmer.

(Franks Dep. at 32.)

17

66.     When asked to state in interrogatories **each and every reason** why Lane was terminated, Defendants, under oath as verified by Defendant Franks, **stated only** that "Lane was terminated due to financial difficulties facing the CITY Program." (Ex. 7 at 3.)

67.     After appointing Larry Palmer as interim director, Defendant Franks then **raised Palmer's pay to the same level as Lane's pay before Lane was terminated.** (Franks Dep. at 34:1-4, 81:22-82:3.)

68.     Dr. Franks testified that there was a gray area as to whether all the other employees who had worked for at least six months, except for Lane, were hired under C.I.T.Y. Programs policies (as opposed to CACC policies), and thus whether they had the corresponding six month probationary period. (Franks Dep. at 86-87.)

69.     Dr. Franks was **sure**, however, that Lane was not hired under the six-month probationary period, but that his probationary period was governed by CACC guidelines, and hence three years. (Franks Dep. at 86-87.)

70.     In July of 2007, Lane was taken off the CACC payroll and placed onto the C.I.T.Y. payroll because Chancellor Byrne believed Lane was an employee of the C.I.T.Y. Board of Directors. (Franks Dep. at 48-49.)

71.     Lane was still on the C.I.T.Y. payroll when Defendant Franks, president of CACC, terminated him. (Franks Dep. at 49-50.)

18

72.    Dr. Franks testified that an August 1, 2007 letter stating Lane was being hired under C.I.T.Y. policies, procedures, and guidelines was an "illegal document." (Franks Dep. at 87; Ex. 6.)

73.    When asked at his deposition why Lane did not get the same benefit of the doubt as the other employees who were considered past their six-month probationary period, Dr. Franks answered, "Because he was the only employee that had an appointment letter from the president of the college." (Franks Dep. at 89.)

74.    At his deposition, Dr. Franks agreed that the August 1, 2007 letter hiring Lane under the C.I.T.Y. guidelines came after his August, 2006 appointment letter from the president of CACC. (Franks Dep. at 88-89, 102; Ex. 6.)

75.    Despite the August 1, 2007 letter, hiring Lane under C.I.T.Y. Guidelines, Defendants assert that Lane was unambiguously a probationary employee because he was an employee of CACC and was therefore subject to the three-year probationary period, not the sixth month period. (Ex. 7 at 3.)

76.    Franks testified that he believed Lane was unambiguously not hired under the C.I.T.Y. Programs guidelines despite Chancellor Byrne's prior decision and written notice to the contrary. (Franks Dep. at 47-49; Pl.'s Ex. 2 to Franks Dep.)

77.    Franks testified at his deposition that nobody told him he needed to send the rescission letters after he terminated the 29 employees. (Franks Dep. at 92.)

19

78.     At his deposition, Franks testified that he consulted Bradley Byrne and sought his concurrence before terminating Lane. (Franks Dep. at 94:11-19.)

79.     In their responses to Plaintiff's Interrogatories, however, Defendants answered under oath, as verified by Defendant Franks, that they were aware of **no communications related to the decision to terminate Plaintiff**, other than the termination letter sent by Defendant Franks. (Ex. 7 at 9-10, 12.)

### Lane Was Terminated In Retaliation For His Testimony

80.     At his deposition, Lane testified that the timing of his termination by Dr. Franks was very suspicious – right around the time that the budget process was beginning in the legislature. It is one reason that Lane believes he was retaliated against by Dr. Franks. (Lane Dep. at 201:3-202:18.)

81.     Defendant Franks was aware of the Sue Schmitz prosecutions as a result of reporting in the newspaper. (Franks Dep. at 38:15-39:5, 41:12-15, 43-44.)

82.     Defendant Franks testified that he was aware that Lane had testified at Sue Schmitz' trial because Lane told Franks, sometime before Lane was terminated, that he had testified. (Franks. Dep. at 41:16-23 - 42, 90:4-17; Ex. 7 at 11.)

83.     After Lane had testified at both the grand jury proceeding and Schmitz' first trial, and while Lane was still an employee of CACC, he discussed with Dr. Price that there was a second trial pending and that he would again have to testify. (Lane

Dep. at 189:16-190:4, 193:15-194:7, 240:11-16.)

84.     Lane also had conversations with Joan Davis, assistant counsel for CACC, who told Lane that he had "a lot of balls" to do what he was doing, because he was taking a great chance. (Lane Dep. at 194:10-18, 240:17-23.)

85.     At his deposition, Lane testified that the totality of the situation and Dr. Franks' actions lead him to believe that he was being retaliated against for his testimony. (Lane Dep. at 201:3-202:18, 220:13-221:9, 231:1-8, 236:11-21.)

86.     Schmitz had before made input into who should be the director of C.I.T.Y. Programs. For example, Schmitz testified at trial that she once told Susan Sallatto, on a trip to Washington, D.C., that Charles Foley should be the director of C.I.T.Y. Programs. (Ex. 4 at 345-47.)

87.     Defendant Franks **often** had discussions with Paul Hubbert about the C.I.T.Y. program, including, and especially, during the 2009 legislative session. (Franks Dep. at 23-24.)

88.     Paul Hubbert was so personally involved with the C.I.T.Y. program that he personally assisted with some supplemental appropriations for the program in 2009. (Franks Dep. at 25.)

89.     When Defendant Franks was asked at his deposition whether he ever had any discussions with Paul Hubbert about Edward Lane, Franks answered: "No, I can't

remember."[2] (Franks Dep. at 25.)

90.     Franks testified that, at the time of Lane's termination, Franks was aware of the existence of statutes that prohibited retaliation for testimony that someone provided in the course of a criminal proceeding. (Franks Dep. at 91:15-19.)

91.     Lane testified at his deposition that, based on the circumstances, he believed that Bradley Byrne appeared to be cleaning up the two-year system for merely political reasons in his bid for governor. (Lane Dep. at 221:10-222:2.)

92.     **After Larry Palmer was reinstated as acting Director of C.I.T.Y. Programs as a result of Lane's termination, Palmer was unable to authenticate key documents at Schmitz' second trial that he had been able to authenticate at Schmitz' first trial. The documents were a very important part of the Government's case against Schmitz.** (Lane Dep. at 232:16-234:21; Ex. 3 at 464-65, 472:12-16, 475:9-16.)

**C.I.T.Y. Programs Becomes S.P.A.N. In 2009**

93.     In 2009, the services of C.I.T.Y. Programs were re-formed into the S.P.A.N. Program (Special Programming Achievement Network). (Lane Dep. at 154:9-16, 155:3-13, 156:1-10; Franks Dep. at 22-23.)

---

[2] Plaintiff notes here that a jury is free to draw inference from both the denial and qualification made by Dr. Franks regarding whether his frequent conversations with Hubbert about the C.I.T.Y. Programs ever included discussion of Plaintiff Lane, the Director of the C.I.T.Y. Programs.

94.   The allocation of funding for the C.I.T.Y. Program was moved by the legislature to the Department of Youth Services. That department used the funds to reform C.I.T.Y. Programs into the S.P.A.N. program. (Franks Dep. at 22-23.)

95.   Defendant Franks had separately agreed with Paul Hubbert and Chancellor Byrne that they all supported the transfer of the funds for the C.I.T.Y. program to the Department of Youth Services. (Franks Dep. at 22-23.)

## II.   STANDARD OF REVIEW

Summary judgment may be rendered only when the court finds that the papers supporting and opposing the motion reveal that no issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

"As the moving party, [defendants have] the burden of showing the absence of a genuine issue of material fact, and for these purposes the material [they] lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14 (1986); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918, 919 (11th Cir. 1993). The district court cannot weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in

his favor." *Hairston*, 9 F.3d at 919, quoting *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513-14.

In this case, summary judgment is inappropriate because of the wealth of credibility determinations, inferences from circumstantial evidence, and determinations of intent and motive to be made by the fact-finders. Plaintiff has established sufficient facts that, when viewed in the light most favorable to him, support a jury finding as to every element of every one of his claims.

## III.   ARGUMENT

### A.   Plaintiff's §1983 First Amendment Retaliation Claim

To set forth a claim of retaliation, a public employee must show: (1) he was speaking as a citizen on a matter of public concern; (2) his interests as a citizen outweighed the interests of the State as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action. *See, e.g.*, *Akins v. Fulton County*, 420 F.3d 1293, 1303 (11th Cir. 2005). If the plaintiff establishes these elements, the burden shifts to the defendant to prove it would have made the same adverse employment decision absent the employee's speech. *Id.*

   1.   <u>Defendant Franks is not immune from suit in his official or individual capacity</u>

Plaintiff has alleged a claim of First Amendment retaliation, brought pursuant to 42 U.S.C. §1983, against Defendant CACC and Defendant Franks in both his

individual and official capacities.[3]

Defendants argue that Defendants CACC and Dr. Franks in his *official* capacity are not persons subject to suit pursuant to 42 U.S.C. §1983 – but this is true *only to the extent that the Eleventh Amendment bars relief for **money damages** against the State.* In his count for First Amendment retaliation, brought against all Defendants, Plaintiff seeks "(a) [p]lacement in the position in which he would have worked absent the Defendants' retaliatory treatment . . . " and "(h) [s]uch other legal or equitable relief to which Plaintiff may be entitled . . . ." (Doc. 11, Plaintiff's Amended Complaint, at 12 - 13.) Plaintiff's claim under § 1983 against Defendant Franks in his official capacity is perfectly valid to the extent that it demands prospective equitable relief. *See Will v. Michigan Dept. of State Police*, 591 U.S. 58, 71 n. 10 (1989)("Of

---

[3]In their brief, Defendants apparently make the argument that Plaintiff has not correctly plead a claim pursuant to § 1983. (Doc. 34 at 20-21.) Defendants' motion to dismiss analyzes Plaintiff's First Amendment claims with §1983 case law (Doc. 5 at 6), as does Plaintiff's response brief (Doc. 6 at 9-10). Plaintiff clearly plead sufficient facts to support his claim of First Amendment retaliation, which, as Defendants state correctly, may only be brought pursuant to 42 U.S.C. § 1983. That Plaintiff has properly plead these claims is supported by this Honorable Court's order denying Defendants' motion to dismiss these claims: "The motion is DENIED as to Counts I and II because the court finds the Plaintiff has pled sufficient facts to support these claims." (Doc. 9 at 1.) Defendants also now argue (for first time, at the summary judgment phase, and in a footnote) that Plaintiff failed to allege that he was deprived of a constitutional right under color of state law. (Doc. 34 at 21 n. 9.) Plaintiff has clearly alleged in his Amended Complaint (Doc. 11), and supported in this brief, sufficient facts to support his claim that he was deprived of a property interest, his employment, by Defendants Franks and CACC, under color of law. This conclusion is also supported by this Honorable Court's order denying Defendants' motion to dismiss this claim. (Doc. 9 at 1.) Plaintiff also notes that Defendants simultaneously argue that there was no color of state law in Franks' actions, but that somehow he is entitled to sovereign immunity.

course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State,' . . . This distinction is 'commonplace in sovereign immunity doctrine' . . . .")(internal citations omitted). Plaintiff has properly plead a § 1983 cause of action against Defendant Franks in his official capacity, and if a judgment is rendered in his favor, Plaintiff has properly demanded the prospective equitable relief available by law.

Defendant Franks in his *individual* capacity is also a "person subject to suit" in this action. A judgment against Franks in his individual capacity for money damages is not a judgment that "would expend itself on the public treasury or domain" if Defendant Franks is found to be individually liable for retaliating against Plaintiff in violation of Plaintiff's clearly established constitutional rights (an action that would also pierce Defendant Franks' qualified immunity). *Harbert Int'l v. James*, 157 F.3d 1271, 1277 n. 3 (11th Cir. 1998).

While the affirmative defense of qualified immunity is discussed *infra*, Defendants are incorrect in their apparent assertion that Franks, in his individual capacity, is flatly *immune from suit* under 42 U.S.C. § 1983, without further analysis, simply by nature of his state employment. Defendants have cited no case law in support of their contention that Defendant Franks is immune from a §1983 claim

26

against him in his individual capacity solely because he was allegedly "acting in his official capacity." (Doc. 34 at 21-22.) Plaintiff has alleged a § 1983 cause of action against Defendant Franks in his individual capacity, and thus Franks is individually subject to suit. Defendant Franks, in his individual capacity, must rely on his arguments against the merits of Plaintiff's First Amendment retaliation claim in support of his motion for summary judgment.

2.     Plaintiff's speech was protected by the First Amendment

Defendants assert that Plaintiff was not "speaking as a citizen on a matter of public concern" because he was testifying in his capacity as Schmitz' former boss and pursuant to subpoena. Defendants' assertion, however, relies on a misunderstanding (or mischaracterization) of the case law.

It is true that the First Amendment is not implicated where a plaintiff speaks as an employee pursuant to his official duties. The case cited by Defendants in support of their assertion that Lane was speaking pursuant to his official duties is *Garcetti v. Ceballos*, 547 U.S. 410 (2010). (Doc. 34 at 23.) In that case, the relevant inquiry was whether an internal memorandum written by the plaintiff in the course of his job duties was protected speech made as a citizen, or whether he was speaking as an employee. *See Garcetti v. Ceballos*, 547 U.S. at 422-23. The Supreme Court stated: "We hold that when public employees make statements pursuant to their

27

official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.*

In this case, Plaintiff Lane's claim is not based on an internal memo outlining that Sue Schmitz was not performing her job, prepared as part of his duties as C.I.T.Y. Program Director. Were he testifying at a civil trial on claims brought by Schmitz of wrongful termination, Defendants might have a point. He wasn't. Lane's claims are based on his **sworn testimony at a criminal proceeding** that garnered significant media attention – a proceeding that was itself part of a larger probe into government corruption by state legislators. That Lane was called to testify to his personal knowledge he acquired as a result of his employment is irrelevant to the analysis, and none of the cases cited by Defendants support such a contention.

Lane was testifying to a matter of *great* public concern. Generally, Lane was testifying regarding corruption in Alabama's two-year college system. Specifically, he was testifying that a prominent public official, in a public job drawing a salary of taxpayer-supplied funds, was doing no work at the job she received because of her political associations.

Similarly, Defendants cite *D'Angelo v. Sch. Bd. Of Polk County*, 497 F.3d

28

1203 (11ᵗʰ Cir. 2007), to support their contention that Lane's speech was not protected because he did not speak as a citizen. In *D'Angelo*, the allegedly protected speech was a school Principal's attempt to convert a school into a charter school – an activity that, by Florida statute, could be performed by the principal. *See D'Angelo*, 498 F.3d at 1210-11. In that case, the principal admitted that he was requesting the change as part of his role as a principal, not as a citizen. *See id.* While Defendants have indeed cited a case in which a court ruled that a plaintiff was not speaking as a citizen, the facts of that case are *easily* distinguishable with this case. Here, Plaintiff Lane's protected speech was not made in the furtherance of his job duties, but under oath at a criminal proceeding involving a matter of great public concern and interest.[4]

According to the Defendants' logic, if Lane's testimony at Sue Schmitz' grand jury and criminal proceedings was a part of his employment and within the scope of his employment duties, then was Lane's testimony at Schmitz' second trial, *after he was terminated,* also part of his employment and within the scope of his daily duties? Obviously, then, testifying pursuant to subpoena at criminal trials of government employees was not part of Lane's job duties as Director of C.I.T.Y. Programs. Lane testified to the same facts and concerns both while he was employed by CACC and

---

[4] Plaintiff notes that, at trial, this Court may take judicial notice of the fact that *The Birmingham News* won a Pulitzer Prize for its reporting on the two-year college scandal – further evidence of the scandal's public interest.
   *See, e.g.*, http://blog.al.com/spotnews/2007/04/news_blackledge_has_won_the_pu.html

afterward, while he was no longer an employee of CACC: as a citizen on a matter of public concern.

In a last ditch effort to assert that Lane's speech is not protected, Defendants claim that, because Lane testified pursuant to subpoena, his testimony is not protected. In support of this proposition, Defendants cite *Morris v. Crow*, 142 F.3d 1379, 1382-83 (11th Cir. 1998). *Morris*, however, stands for no such proposition that testifying pursuant to a subpoena somehow removes First Amendment protections; *Morris* stands for the proposition that any speech isn't **automatically protected** by being made pursuant to subpoena – the speech still has to be on a matter of public concern. *See Morris*, 971 F.2d at 1382. In *Morris*, the plaintiff's speech was not protected because he was not speaking on a matter of public concern, he was simply authenticating an accident report he took down in the scope of his employment, pursuant to subpoena. *Id.* ("Nor is there any evidence that Morris gave deposition testimony for any reason other than in compliance with a subpoena to testify truthfully in the civil suit regarding the November 1989 accident. . . . The mere fact that Morris's statements were made in the context of a civil deposition cannot transform them into constitutionally protected speech.")

The court in *Morris*, on the very pages cited by Defendants, actually distinguishes the facts therein with *Martinez v. City of Opa-Locka*, 971 F.2d 708 (11th

30

Cir. 1992). *See Morris*, 142 at 1382. In *Martinez*, a "Commission, sitting as a Board of Inquiry, **subpoenaed** Martinez to testify concerning the purchasing practices of the City." *Martinez*, 971 F.2d at 710. Under those circumstances, similar in many respects to the case herein, the Eleventh Circuit held that "Martinez' testimony was speech that clearly affected a matter of public concern." *Id.* at 712.

Defendants' claim that testimony pursuant to subpoena is not protected by the First Amendment is improperly cited, unsupported in the case law, and nonsensical given the purpose of First Amendment protections. *See also Karl v. City of Mountlake Terrace,* 2012 WL 1592181 (9th Cir. 2012)("The district court held it was clearly established in December 2008 that a supervisor cannot retaliate against a public employee for his or her **subpoenaed** deposition testimony offered as a citizen in the context of a civil rights lawsuit. We affirm.")(emphasis added).

In this case, Plaintiff Lane was speaking as a citizen on a matter of public concern when he testified in criminal proceedings against a state legislator accused of corruption and violation of Federal criminal statutes.

Furthermore, Lane's interest in testifying as a citizen was not outweighed by some interest of the state.[5] Thus, the final inquiry in Lane's prima facie showing of

---

[5] Understandably, in their brief Defendants do not dispute the second element – whether Lane's interests as a citizen were outweighed by the interests of the state as an employer. (Doc. 34 at 22-24.) If they had made such an argument, they would have been forced to argue that the state has an important interest in preserving corruption by legislators in violation of Federal law.

First Amendment retaliation is the causation element: whether Lane's protected testimony played a "substantial" or "motivating" role in his termination.

      3.     <u>Defendants were motivated to terminate Plaintiff because of his protected speech</u>

In their brief, Defendants argue that the temporal proximity of Lane's termination to his testimony is alone insufficient to support a finding of motivation, and that Plaintiff lacks additional evidence of **retaliatory motive**: "In this action, there is no evidence of causation at all . . . ."  (Doc. 34 at 24.)

Plaintiff has cited significant factual support for **retaliatory motive**, including statements made by Franks at his deposition, inferences that can be raised by Franks' inconsistent testimony, statements made by Schmitz at her second trial (and conflicting statements made by Schmitz at her deposition), and statements made at trial by Charles Foley, Larry Palmer, and Plaintiff Lane.

It is clear from the trial testimony of several witness, and the deposition of Schmitz, that Sue Schmitz received her job due to an **instruction** given to CACC by Paul Hubbert, Executive Secretary of the Alabama Education Association. Charles Foley (Ex. 1 at 144-45), Larry Palmer (Ex. 3 at 392-93), and Edward Lane (Ex. 4 at 1247) all testified at trial to these facts. Palmer and Foley said as much before Lane was even terminated. (*See* id.) Furthermore, Sue Schmitz admitted as much in her

deposition. (Schmitz Dep. at 18-19, 42.)

Whenever Schmitz was challenged about her job performance at C.I.T.Y. Programs, she was quick to invoke the name of her powerful friends, including Hubbert. (Ex. 3 at 422-23; Ex. 2 at 183-84; Ex. 4 at 1250.) Employees of the C.I.T.Y. Program were hesitant to question, or even evaluate, Schmitz, for fear that they would lose funding in the legislature or face some other kind of harm, which itself speaks to the influence wielded by Schmitz and her powerful allies. (Ex. 3 at 397, Ex. 3 at 543, Lane Dep. at 196:13-16, 197:1-11.)

Lane was warned by many people around him about the potential implications of challenging Schmitz and those who placed her at CACC. John Caylor, C.I.T.Y.'s legal counsel, who suggested that Lane investigate Schmitz (Lane Dep. at 166, 170-71), also warned Lane that both Lane and C.I.T.Y. Programs could be affected. (Lane Dep. at 197.) McGuirt asked Lane if he was sure he wanted to go through with it (Lane Dep. at 15-21), told him that his actions could bring him problems (Lane Dep. at 186), and told him to be careful (Ex. 4 at 1248).

When Lane terminated Schmitz, Paul Hubbert was the first to know. (Schmitz Dep. at 26-27.) Schmitz then told Foley that she was going to get back at Lane, and that if she got the chance she would tell Lane that *he's* fired (Ex. 1 at 173-74) – a statement she admitted at her second trial (Ex. 5 at 319), but had forgotten by the time

of her deposition (Schmitz Dep. at 40).

Franks returned to Alabama[6] and met Schmitz at a legislative session, (Franks Dep. at 37:12-21), but Schmitz testified that she couldn't remember whether she had ever met, or had any communications, with Franks. (Schmitz Dep. at 15-17, 51.) Almost as soon as he was made President, Franks terminated Lane with Lane's own suggested Reduction in Force proposal (Lane Dep. at 70:22-71:3), while knowing that Lane was not planning on being a part of his own reduction in force. (Franks Dep. at 64:10-12.)

The timing of Lane's termination was not only a few months after Lane testified, but was also around the same time that the budget process was beginning to start in the legislature (Lane Dep. at 201-02.) Even if terminating Lane was purely Franks' idea to help secure funding, an inference that a jury could make based on the evidence, those facts would also support Lane's claim of retaliation. Furthermore, Paul Hubbert, who had instructed Franks' predecessor to hire Schmitz, and who was the first to know when Schmitz was terminated, was himself intimately involved in

---

[6] Defendants have emphasized that Franks was in Arkansas for eleven years before he was hired as CACC President, suggesting an inference that he was not involved in local Alabama politics and thus could be not possibly have had retaliatory motive. Plaintiff notes here that Defendant Franks was born in Alabama (Franks Dep. at 6:23), graduated from the University of Alabama (Franks Dep. at 14), served in the Alabama National Guard (Franks Dep. at 9:12), and worked at the Alabama Department of Education from 1988 to 1996, before his move to Arkansas (Franks Dep. at 17.) He had known at least one legislator before moving to Arkansas. (Franks Dep. at 54.) On these facts, a jury is free to draw whatever inference it chooses.

helping C.I.T.Y. Programs secure funding in the 2009 legislative session. (Franks Dep. at 25.) **Shortly after Franks returned to Alabama and was hired as CACC President, he and Hubbert were having frequent discussions about C.I.T.Y. Programs during the legislative session – all around the same time Lane was terminated.** (Franks Dep. at 23-24.)

Whether Paul Hubbert instructed Steve Franks to fire Edward Lane (just as Hubbert had instructed Franks' predecessor to hire Schmitz), or whether Franks decided to terminate Lane to curry favor with Hubbert and his friends in the legislature, is a matter for the jury. Regardless, Plaintiff has brought forth ample evidence to support his claim that his termination by Defendants was motivated by retaliation for his protected speech as the star witness against Sue Schmitz.[7] The only evidence Plaintiff lacks in this case is an admission by the involved parties that they in fact terminated Lane due to his protected speech, or a statement of a third-party witness or recording of such back-room dealings. Whether Plaintiff would have been fired absent his protected speech requires a credibility determination that is reserved for the jury, and thus summary judgment should be denied. *See Martinez*,  971 F.2d

---

[7] The jury should be permitted to make what it will of the fact that Larry Palmer, who changed his testimony from Schmitz I to Schmitz II, and could not recall enough to authenticate key documents at the second trial, curiously was awarded Lane's job upon Lane's termination. Plaintiff submits that the Palmer odyssey further corroborates causation. (Franks Dep. at 32; Lane Dep. at 232:16-234:21; Ex. 3 at 464-65, 472:12-16, 475:9-16.)

at 713.

> 4.   <u>A jury could reasonably find that Lane would not have been terminated absent his protected speech</u>

To rebut Plaintiff's evidence that he was fired in retaliation for his protected speech, Defendants claim that Lane would have been terminated regardless because he was fired for "financial reasons." (Doc. 34 at 25-26.) In asserting this reason, however, Defendants are forced to walk a fine line by claiming that firing Lane, the Director of C.I.T.Y. Programs, made financial sense, **without** being able to point to Lane's performance as Director of C.I.T.Y. Programs. When asked to state in interrogatories **each and every reason** why Lane was terminated, Defendants, under oath as verified by Defendant Franks, **stated only** that "Lane was terminated due to financial difficulties facing the CITY Program." (Ex. 7 at 3.)

There is no evidence in the record supporting any criticism of Lane's performance as director. Lane has no record of discipline, nor was he ever evaluated. Lane made many productive budgetary steps and accomplishments with C.I.T.Y. Programs – progress that pleased the CACC board before Franks was hired. (Lane Dep. at 47, 60-61, 90-92; Ex. 4 at 1254.) It was those budget cutbacks that actually lead to Lane's discovery of Schmitz' lack of work at C.I.T.Y. Programs. (Lane Dep. at 166, 170-71.) **The budget problems in 2008 were a result of the poor U.S.**

**economy and resulting prorated cuts and withdrawn grants – not Lane's performance – and Defendants never asserted Lane's blame**. (Lane Dep. at 72-72, 105-07, 111-12, 147-48; Ex. 7 at 3.)

Before Lane, the Director, was fired through a Reduction in Force, he was suggesting a RIF as a method of addressing the budgetary problems. (Lane Dep. at 72-73, 114-15, 118-19, 148-49; Franks Dep. at 21, 64.) Lane had made the same suggestion to Franks directly, but Franks did not respond to Lane with any details regarding the implementation of a Reduction in Force. (Lane Dep. at 119-20, 125-27.)

Franks terminated 28 employees on January 9, 2008, and 26 of those employees received letters rescinding their termination less than three weeks later. Lane, the director, and one low-level employee who had been working less than six months, were the only two employees who did not get to come back. (Lane Dep. at 122:10-21; Franks Decl. at ¶ 8.) The reason Defendants offer for this disparity is that Franks believed that those 26 employees were *ambiguously* hired under a six-month probationary period, while Lane was *unambiguously* hired for a three year probationary period.

While Franks claims to have believed that there was no gray area as to Lane's three year probationary period, he had been exposed to much evidence to the contrary. While Lane was hired by CACC in 2006, a year later, in 2007, Lane signed

37

a contractual offer for a probationary period **according to C.I.T.Y. Program guidelines** (and thus a corresponding six month probationary period) – the last contract that Lane signed relative to his employment at C.I.T.Y. Programs.[8] (Ex. 6; Franks Dep. at 49-50.) As a result, Bradley Byrne moved Lane from the CACC payroll to the C.I.T.Y. Payroll in 2007, where he remained until his termination. (Franks Dep. at 49-50.)

Not only does the disparity in how "ambiguous" Franks considered the respective employees' probationary period show that the reason offered for Lane's termination is questionable, but the disparity allows for a reasonable jury inference that Franks was looking for a way to terminate Lane – **additional evidence that Lane's testimony motivated Franks' decision to terminate him (or to not bring him back).** (*See* Section 3, *supra*.)

Curiously, Defendants never established *when* Franks realized that the 26 reinstated employees could fit into a different category than Lane. A jury could infer that Franks was aware of this possible distinction before ever implementing the reduction in force. In support of such an inference, Franks testified that he was never told by anyone that he should rescind the terminations of the 26 probationary

---

[8] In his deposition, Franks protested that this contract was an "illegal document." (Franks Dep. at 87.) It is undisputed that if Lane's employment were governed by a six-month probationary period, he would long since have met it, and could not have been removed.

employees. (Franks Dep. at 92.) Franks made the decision to rescind 26 employees himself, and the jury is free to infer **when exactly** he made that decision in addition to **why** – whether before or after he initiated the RIF. It should be noted that a jury could also infer that Franks retaliated against Lane at the point in time that Franks was faced with the decision to rescind Lane's termination or not, and did so either out of instruction **or** a desire to gain favor with the legislature, or Schmitz' powerful friends. For a jury, even the fact that Franks had recently moved back to Alabama could support a motive of Franks' need to buddy up quickly. Any of these possibilities would support Lane's retaliation claims.

In addition to the curious context of the decision to rescind most of the reduction in force, Defendants have not offered an adequate explanation as to how the termination of Lane was required by the reduction in force, or how terminating Lane saved a significant amount of money. When Franks reinstated Palmer as interim director, his pay was raised, per Franks' recommendation, to that of Lane's pay. (Franks Dep. at 34, 81-82.) After Palmer was reinstated as interim director, and his pay raised significantly, he was unable to authenticate important government documents at Schmitz' second trial that he was able to authenticate in the first. (Lane Dep. at 232-34; Ex. 3 at 464-65, 472, 475.) This change in testimony could have been something innocent, it could have been the result of an agreement with Franks,  or it

39

could have been motivated by a fear of the same reprisal that befell Lane.

Seemingly as an afterthought, Franks signed a declaration that the decision to terminate Lane, and then to not rescind his termination, did save some amount of money – apparently it saved the amount of Palmer's salary before becoming interim director for the second time. (Franks Decl. at ¶ 17.) Defendants have not explained – anywhere – how this amount of money was significant to saving C.I.T.Y. Programs, nor why these savings necessitated the termination of the Director of said program (who had conceived of, authored, and, conceivably, who would have implemented the RIF), nor why such an arrangement required a "reduction in force" as its vehicle.

Defendants have not met their burden of demonstrating that, with the evidence viewed in the light most favorable to Plaintiff, they would have made the same decision regarding Lane's termination regardless of his testimony. The reason offered by Defendants is utterly unconvincing, especially in light of the summary judgment standard of review.

### 5.    Defendant Franks is not entitled to qualified immunity

"It is well-established that a public employee may not be punished in retaliation for exercising his First Amendment rights to free speech," *Rankin v. McPherson*, 483 U.S. 378, 383 (1987), and so has it been long before Defendants terminated Edward Lane. Franks does not dispute that this right was clearly established at the time of

40

Lane's termination. (Doc. 34 at 28.)

Instead, Defendant Franks argues that it was not clearly established, at the time of Lane's termination, that Lane's testimony at judicial proceedings *pursuant to subpoena* was protected speech. (*See* Doc. 34 at 28.)

As discussed above, the Eleventh Circuit's 1992 decision in *Martinez* held that testimony at judicial proceedings, pursuant to subpoena, was protected speech. *Martinez*, 971 F.2d at 710. In that case, the Eleventh Circuit quoted the Ninth Circuit: "[S]peech that concerns `issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government merits the highest degree of first amendment protection.'" *Id.* at 713.

In *Martinez*, the Eleventh Circuit held that "[t]he law concerning whether a public employee's expression is constitutionally protected conduct was clearly established at the time Connor fired Martinez." *Martinez*, 971 F.2d at 713. *See also Kurtz v. Vickrey*, 855 F.2d 723 (11th Cir. 1998). With the Eleventh Circuit's decision in *Martinez*, it was also clearly established that testimony at judicial proceedings, by a public employee, **pursuant to subpoena**, on a matter of public concern, was protected speech. *Martinez*, 971 F.2d at 712.

Finally, as discussed above, whether Franks was motivated in part or in whole

by lawful considerations, or whether Franks would have acted differently had Lane not testified, is a jury question. Plaintiff has raised a dispute of material fact as to both of those determinations. As a result, Franks is not entitled to qualified immunity, and Defendants' Motion for Summary Judgment is due to be denied.

## B.     Plaintiff's State Claim

Plaintiff has also brought a state claim against Defendant Franks in his individual capacity under this Court's supplemental jurisdiction. His claim is made under The State Employees Protection Act., Ala. Code § 36-26A-3: "Discharge for reporting violation of law prohibited."

"A supervisor shall not discharge . . . a state employee . . . if the state employee reports, under oath or in the form of an affidavit, a violation of a law, a regulation, or a rule, promulgated pursuant to the laws of this state, or a political subdivision of this state, to a public body." Ala. Code § 36-26A-3. Remedies available against Defendant Franks under this statute include "payment of back wages, front wages, and compensatory damages, or any combination of these remedies." § 36-26A-5.

The factual support for the violation of this statute is essentially the same as the factual support outlined above for finding that retaliation was the but for cause of Lane's termination. Thus, Plaintiff relies on his arguments and facts, as cited to the record, outlined above to support his claim under this statute.

42

**C.     Plaintiff Is Entitled To Compensatory Damages Beyond 2009**

Defendants claim that, even if had Lane not been terminated, he would have "no longer held that position as of September 2009 . . . " (Doc. 34 at 24), and thus summary judgment should be granted as to damages after that date.

A jury could just as easily find that, had Lane not been terminated in 2009, he would have continued in his role as director of the program when it was moved to the Department of Youth Services, just as many of his former employees have. C.I.T.Y. Programs operates intact today as S.P.A.N. (Special Programming Achievement Network). (Lane Dep. at 154:9-16, 155:3-13, 156:1-10; Franks Dep. at 22-23.)

In addition, Franks and Hubbert supported the move of C.I.T.Y. Programs away from CACC – something they agreed on in their frequent communication. (Franks Dep. at 22-23.) A jury could infer that Defendants' support for the move of C.I.T.Y. Programs served as an attempt to insulate themselves from compensatory civil damages.

**IV.     CONCLUSION**

Because Plaintiff has submitted enough evidence, when viewed in the light most favorable to him, to support a jury finding as to every element of every one of his claims, summary judgment is due to be denied.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully requests

that this Honorable Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

/s/ Adam W. Pittman
**John D. Saxon, Esq.**
**State Bar No. ASB-3258-O71J**
**Adam W. Pittman, Esq.**
**State Bar No. ASB-0146-A33P**
**Attorneys for Plaintiff**

**OF COUNSEL:**
**JOHN D. SAXON, P.C.**
**2119 3ʳᵈ Avenue North**
**Birmingham, AL 35203**
**Tel.:      (205) 324-0223**
**Fax:      (205) 323-1583**
**Email:   jsaxon@saxonattorneys.com**
**            apittman@saxonattorneys.com**

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the above and foregoing Plaintiff's Opposition to Defendants' Motion for Summary Judgment upon all counsel of record by filing same with the CM/ECF system, which will provide electronic notice to the following:

**Mark T. Waggoner, Esq.**
**Stephen N. Fitts, III, Esq.**
**HAND ARENDALL LLC**
**1200 Park Place Tower**
**2001 Park Place North**
**Birmingham, Alabama  35203**
mwaggoner@handarendall.com
sfitts@handarendall.com

44

**DONE** this the 22nd day of May, 2012.

/s/ **Adam W. Pittman**
**OF COUNSEL**