**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| **Edward R. Lane,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV-11-BE-0883-M** |
| | ) | |
| **Central Alabama Community College,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION**</u>

This matter comes before the court on Defendants Central Alabama Community College and Dr. Franks' "Motion for Summary Judgment." (Doc. 34). Plaintiff Mr. Lane brought state and federal retaliation claims against CACC, Dr. Franks in his official capacity, and Dr. Franks in his individual capacity for allegedly terminating him in retaliation for testimony he gave at a criminal trial.

The court finds that the Eleventh Amendment and the doctrine of qualified immunity bar Mr. Lane's claims against CACC, an arm of the state of Alabama, his claims against Dr. Franks, in his official capacity as President of CACC, and his claims against Dr. Franks in his individual capacity as discussed below.  Thus, the court will grant the Defendants' Motion for Summary Judgment as to all claims.

I.      <u>STATEMENT OF FACTS</u>

      A.      <u>Factual History</u>

           <u>Mr. Lane's Employment Status at C.I.T.Y.</u>

On September 26, 2006, Defendant Central Alabama Community College ("CACC")

hired Plaintiff Edward Lane as the probationary Director, the highest ranking position, of the Community Intensive Training for Youth (C.I.T.Y.) Program at CACC. C.I.T.Y. is a statewide program for underprivileged youth with multiple offices throughout Alabama.  In his job as Director, Mr. Lane ran the program, including day-to-day operations, hiring and firing of employees, and making financial decisions.

Mr. Lane's original hire letter in 2006 was from CACC's then-President, Linda McGuirt, and Ms. McGuirt informed Mr. Lane that she was his supervisor.  In the summer of 2007, however, Chancellor Byrne determined that Mr. Lane was actually an employee of the Board of Directors of C.I.T.Y., not an employee of Central Alabama Community College and sent C.I.T.Y.'s business manager a letter to that effect. In August 2007, the President of the C.I.T.Y. Board of Directors, Helen McAlpine, sent Mr. Lane a letter offering him a probationary appointment as Director of the C.I.T.Y. program beginning August 1, 2007; Mr. Lane accepted the appointment from the Board of Directors.

<u>C.I.T.Y.'s Financial Problems during Mr. Lane's Employment</u>

As soon as he took his position at C.I.T.Y., Mr. Lane began an audit to evaluate the program's financial position because C.I.T.Y. was experiencing significant financial problems. During this audit, Mr. Lane discovered that then-state representative Suzanne Schmitz was listed on C.I.T.Y.'s payroll but did not appear to be coming to work or producing any tangible work product. John Caylor, CACC's attorney, warned Mr. Lane that taking actions against Ms. Schmitz could have bad repercussions for both Mr. Lane and CACC. On October 19, 2006, Mr. Lane terminated Ms. Schmitz from her employment at C.I.T.Y.  After her termination, Ms. Schmitz commenced a civil lawsuit to get her job back at C.I.T.Y., and she made comments to

Charles Foley, then-Madison County C.I.T.Y. program coordinator, that she planned to "get [Mr. Lane] back" for her termination. (Doc. 38, at 10). Ms. Schmitz also said that if Mr. Lane was to request money for C.I.T.Y. from the state legislature, she would tell him, "You're fired." *Id.*

When Mr. Lane was hired in 2006 by the then-President of CACC, Ms. McGuirt, C.I.T.Y's Mobile and Montgomery programs were slated to close because of loss of grant money. Mr. Lane decided to keep these programs and started a new program in Lauderdale County. Mr. Lane did not instruct anyone at C.I.T.Y to actively look for grant opportunities or write grant applications; he also was not looking or applying for grants himself. The two-year college system had a department that received federal grants, and C.I.T.Y. requested some of these grants under Mr. Lane's direction.

Mr. Lane claims that he was able to keep all of the programs running because he successfully controlled expenditures at C.I.T.Y. CACC disputes the alleged "controlled expenditures" and claims that Mr. Lane was only able to keep all of the programs running because of a one-time legislative appropriation and a one-time private donation. CACC further claims that Mr. Lane did not try to do anything to gain funding for the program except submit a budget to the legislature every year.  The Alabama legislature only appropriated sufficient funding to C.I.T.Y for one year under Mr. Lane's leadership, and then it cut C.I.T.Y's funding dramatically. In 2008, C.I.T.Y.'s budget was cut by $1.75 million, approximately one-fourth of its budget.

<u>Mr. Lane's Testimony in Suzanne Schmitz's Criminal Case</u>

After Mr. Lane terminated Ms. Schmitz, the FBI began investigating Ms. Schmitz and C.I.T.Y. On November 13, 2006, Mr. Lane testified before a grand jury that Ms. Schmitz was

fired because she did not "show up for her job." Mr. Lane claims that he also testified as to how

Ms. Schmitz got her job at C.I.T.Y., but no evidence exists to support that contention.

On August 26, 2008, pursuant to a subpoena, Mr. Lane testified at Ms. Schmitz's federal

criminal trial for mail fraud and fraud involving a program receiving federal funds. Mr. Lane

testified that he fired Ms. Schmitz because of her failure to come to work or do her job at

C.I.T.Y.  Mr. Lane also testified that Ms. Schmitz got her job at C.I.T.Y. through Dr. Paul

Hubbert, Executive Secretary of the Alabama Education Association, and that people within the

C.I.T.Y. program were afraid to question Ms. Schmitz's employment because they were afraid of

losing funding from the legislature.  Also at the criminal trial, Larry Palmer, C.I.T.Y.'s Regional

Coordinator,  testified that C.I.T.Y. hired Ms. Schmitz because of the influence of Roy Johnson,

the previous Chancellor of CACC, and Dr. Hubbert. Mr. Lane also testified that when he pressed

Ms. Schmitz about her failure to perform her job at C.I.T.Y., she responded that she "needed to

call Mr. Hubbert." Mr. Lane testified to the same facts again in Ms. Schmitz's second criminal

trial on February 18, 2009.

<u>Mr. Lane's Termination from C.I.T.Y.</u>

In January 2008, Defendant Dr. Steve Franks assumed the position of President of CACC

under then-Chancellor of Alabama's two-year college system, Bradley Byrne. Even before Mr.

Lane began reporting to Dr. Franks, Mr. Lane was considering a Reduction in Force ("RIF") at

C.I.T.Y.  On November 20, 2008, Mr. Lane began reporting to Dr. Franks, but had only very

little contact with Dr. Franks during his employment with C.I.T.Y.

Mr. Lane communicated C.I.T.Y.'s budget problems to Dr. Franks in November 2008,

including his recommendation for a RIF. Mr. Lane and Dr. Franks continued their talks about a

4

RIF throughout the end of 2008 and by the end of 2008, C.I.T.Y. was in danger of not making its payroll on time every month, if at all. Dr. Franks agreed with Mr. Lane's RIF recommendation, and Dr. Franks initially responded that all probationary employees should be terminated.

On November 20, 2008, Chancellor Byrne dissolved the C.I.T.Y. Board of Directors and communicated that in accordance with the administrative law ruling in *Robinson, Schmidt, & Settle v. City Skills Training Consortium & Central Ala. Comm. College*, No. OAH-06-388, all C.I.T.Y. employees were to be considered employees of CACC.

The Defendants claim that on January 9, 2009, Dr. Franks made the financial decision to terminate Mr. Lane and other probationary employees associated with the C.I.T.Y. program.  Dr. Franks did not give Mr. Lane any reason for his termination, but Dr. Franks testified that "Lane was terminated due to financial difficulties facing the C.I.T.Y. program."  (Doc. 38, at 18).  Dr. Franks consulted with Chancellor Byrne before terminating Mr. Lane. Mr. Lane disputes that Dr. Franks made this decision based on financial reasons and believes that Dr. Franks was actually retaliating against Mr. Lane for testifying in Ms. Schmitz's trial.

The Defendants allege that no one, including Ms. Schmitz, instructed Dr. Franks to fire Mr. Lane or suggested to Dr. Franks that he should fire Mr. Lane. Mr. Lane disputes this fact, claiming that a jury could "easily infer" that Dr. Hubbert instructed or suggested Dr. Franks should terminate Mr. Lane.  (Doc. 38, at 5). Mr. Lane also claims that Dr. Franks often had discussion with Dr. Hubbert about the C.I.T.Y. program during the 2009 legislative session, but Dr. Franks specifically testified that he did not consult Dr. Hubbert about his decision to terminate Mr. Lane.

Mr. Lane offered no evidence that Dr. Franks had an agreement with Ms. Schmitz or

Betty Carol Graham, another state representative, to fire Mr. Lane as a result of his testimony

against Ms. Schmitz. Dr. Franks testified that he never discussed Mr. Lane with either Mrs.

Schmitz or Mrs. Graham prior to Mr. Lane's termination. Similarly, Ms. Schmitz testified that

she never talked to Dr. Franks or anyone else within the two-year system who was in a position

to do anything about Mr. Lane's employment after Mr. Lane had testified against her. In fact, Dr.

Franks testified that he only met Ms. Schmitz once briefly at a legislative session, and Ms.

Schmitz testified that she did not remember ever meeting Dr. Franks or having any dealings with

him.

    <u>Dr. Frank's appointment of Larry Palmer as Interim Director</u>

    At the time of Mr. Lane's termination, Dr. Franks named Larry Palmer, then-regional

coordinator, as interim director of C.I.T.Y.  Mr. Palmer had been a C.I.T.Y. employee since the

1990s and had served as interim director once before. When he assumed the role of interim

director, Mr. Palmer continued his role as regional coordinator as well and served in both

capacities. Upon his appointment, Mr. Palmer received a raise because of his added

responsibilities and was making the same salary Mr. Lane had made before he was terminated.

CACC was able to save costs because Mr. Palmer was performing two jobs for one salary. Mr.

Palmer remained interim director until September 2009 when the C.I.T.Y. program ceased to

exist, and Mr. Palmer was terminated along with all C.I.T.Y. employees.

    <u>Dr. Frank's recision of some C.I.T.Y. Employees' Termination</u>

    Sometime shortly after Dr. Franks terminated the C.I.T.Y. employees (a dispute exists as

to when), Dr. Franks decided to rescind the termination of some of the Lauderdale and Franklin

County employees he fired on January 9, 2009. The Defendants claim that Dr. Franks made this

decision on January 23, 2009, and Mr. Lane claims that Dr. Franks sent out the recision letters on January 29, 2009. Regardless, the decision was made before Mr. Lane testified at Ms. Schmitz's second trial on February 19, 2009.

Dr. Franks testified that he rescinded some of the terminations because he learned that these employees were not probationary employees. At the time the employees who had been terminated were hired, a six month probationary period existed for C.I.T.Y. employees. Thus, even though the employees were later deemed CACC employees, at the time of their employment for Fair Dismissal Act purposes, they were employed under C.I.T.Y.'s six-month probationary period, as opposed to CACC's three-year probationary period and were not considered probationary employees when Dr. Franks fired them.

Mr. Lane was one of two employees whose termination was not rescinded.  A dispute exists as to why Dr. Franks did not rescind Mr. Lane's termination.  Dr. Franks testified that he believed Mr. Lane was a probationary employee because he was hired by CACC as evidenced by his initial hire letter, and the CACC probationary period was three years. The Defendants claim that Dr. Franks thought Mr. Lane was in a fundamentally different category than the other employees because he was the director of the entire C.I.T.Y. program and not simply an employee. When asked why he considered Mr. Lane different than the other C.I.T.Y. employees whose termination he rescinded, Dr. Franks responded:  "because he was the only employee that had an appointment letter from the president of [CACC]." (Doc. 38, at 19).

Mr. Lane alleges that Dr. Franks did not rescind his termination because Dr. Franks possessed a "retaliatory motivation." (Doc. 38, at 3). Mr. Lane claims that the timing of his termination is very suspicious; it was "right around the time that the budget process was

beginning in the legislature." (Doc. 38, at 20).  Dr. Franks knew that Mr. Lane had testified at Ms. Schmitz's first criminal trial, but Mr. Lane never discussed the contents of his testimony with Dr. Franks. Mr. Lane also testified that he believed "the totality of the situation" and "Dr. Franks' actions" led him to believe he was being retaliated against for his testimony. (Doc. 38, at 21).

The Defendants claim that Mr. Lane had no reason to believe that Dr. Franks was out to get him or that Dr. Franks' stated reasons for termination and not rescinding that termination were untruthful or pretextual. The Defendants also claim that Dr. Franks did not even remember that Mr. Lane had previously testified in Ms. Schmitz's criminal case and that he did not know Mr. Lane was planning on testifying in her second criminal trial.

The parties do not dispute that Dr. Franks was not aware of any statements by Ms. Schmitz that she would see to it that Mr. Lane would lose his job after he testified against her. The parties do not dispute that Mr. Lane did not discuss with anyone at the College Department of Post Secondary Education, including Dr. Franks, that he was going to testify at Ms. Schmitz's second criminal trial before he did in fact testify.  Dr. Franks had already terminated Mr. Lane when Mr. Lane received notice that he would be testifying at the second trial, and Dr. Franks did not know about the second trial until after it occurred. Dr. Franks never told Mr. Lane not to testify, and neither Dr. Franks nor CACC ever attempted to prevent Mr. Lane from testifying before the grand jury or at either trial.

    B.    <u>Procedural History</u>

This case was originally filed in the Middle District of Alabama on January 3, 2011. Mr. Lane's Complaint alleged three counts: (I) violation of the State Employee Protection Act under Ala. Code 36-26A-3; (II) retaliation for the exercise of protected First Amendment speech; and

8

(III) a violation of 42 U.S.C. 1985, conspiring to injure witnesses for testifying. (Doc. 2-1). It was

transferred to this court on March 4, 2011. On March 11, 2011, CACC filed a Motion to Dismiss

for failure to state a claim. (Doc. 4). This court denied the Motion to Dismiss as to Counts I and

II and granted it as to Count III. (Doc. 9).

On May 24, 2011, Mr. Lane filed an Amended Complaint alleging the same counts as his

original complaint. (Doc. 11). On June 3, 2011, the Defendants filed a Motion to Dismiss Count

III, the conspiracy charge, of the Amended Complaint. (Doc. 12).  The court construed Mr.

Lane's response to Defendants' Motion to Dismiss as a voluntary dismissal of Count III and thus

dismissed Count III without prejudice. (Doc. 15). As Mr. Lane's Amended Complaint stands

now, Count I seeks relief from Dr. Franks for violation fo the State Employee Protection Act and

Count II seeks relief from Dr. Franks and CACC for termination in retaliation for speech

protected by the First Amendment. On April 30, 2012, after discovery by both parties, CACC

filed this Motion for Summary Judgment. (Doc. 34).

II.     STANDARD OF REVIEW

 Summary judgment allows a trial court to decide cases when no genuine issues of

material fact are present and the moving party is entitled to judgment as a matter of law.  *See*

Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must

determine two things: (1) whether any genuine issues of material fact exist; and if not, (2)

whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

Furthermore, all evidence and reasonable inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282. The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.* Additionally, "conclusory assertions. . ., in the absence of supporting

10

evidence, are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997).  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

III.    LEGAL ANALYSIS

Although some genuine issues of material fact exist in this case concerning Dr. Franks' true motivation for terminating Mr. Lane's employment, no genuine issues of material fact exist in the proffered agreed upon statement of facts that bear on the issue of immunity. Because the court finds the Defendants are entitled to judgment as a matter of law and no genuine issues of material fact exist with regard to this dispositive issue, the court will grant summary judgment for the Defendants on this ground.

A.    Absolute Immunity

1.    Central Alabama Community College

Defendant CACC argues that the Eleventh Amendment to the United States Constitution bars Mr. Lane's claim against CACC for retaliation for protected speech. The Eleventh Circuit has held that "state universities are 'agencies or instrumentalities' of the state, and thus are immune from suit in federal court." *University of South Alabama v. American Tobacco Co.,* 168 F.3d 405, 412 (11th Cir. 1999) (quoting *Harden v. Adams*, 760 F.2d 1158, 1163-64 (11th Cir. 1985)).  Both the Southern District of Alabama and the Middle District of Alabama have specifically ruled that community colleges are entitled to Eleventh Amendment immunity. *See Morris v. Wallace Community College-Selma*, 125 F. Supp. 2d 1315, 1335 (S.D. Ala. 2001)("Alabama's state law sovereign immunity extends to community colleges. . ." (citing

11

*Williams v. John C. Calhoun Community College*, 646 So. 2d 1, 2 (Ala.1994))) ; *Wright v.*

*Chattahoochee Valley Community College*, 2008 WL 4877948 (M.D. Ala. 2008) ("State

educational institutions, such as [Chattahoochee Valley Community College] are agencies or

instrumentalities of the state and thus are immune from suit in federal court." (internal quotations

omitted)).

Mr. Lane argues that CACC is not immune from suit for prospective equitable relief, and

because Mr. Lane seeks "placement in the position in which he would have worked absent the

Defendant's retaliatory treatment," "injunctive relief," and "such other legal or equitable relief,"

the Eleventh Amendment does not bar Mr. Lane's suit. (Doc. 11).  However, the Eleventh

Amendment bars monetary *and* equitable relief against the state and its instrumentalities. *Morris*,

125 F. Supp. 2d, at 1335 (citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89,

120 (1984).  CACC, as a community college, is an arm or instrumentality of the state and is

immune from legal *or* equitable suit under the Eleventh Amendment. Therefore, the court will

GRANT Defendants' Motion for Summary Judgment as to CACC on Count II of the Amended

Complaint.

2.    Dr. Franks in his Official Capacity

a.    Money Damages

The Defendants argue that Dr. Franks acting in his official capacity as president of CACC

is not a "person" subject to suit pursuant to 42 U.S.C. § 1983. Mr. Lane argues that Dr. Franks is

only immune to the extent that the Eleventh Amendment bars relief for money damages against

the State. Because Mr. Lane concedes that he cannot seek money damages against Dr. Franks in

his official capacity and because "the Eleventh Amendment bars suits against state officials in

federal court seeking compensatory or retroactive relief," the court will dismiss all claims against Dr. Franks that seek money damages. *See Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999) (citing *Green v. Mansour,* 474 U.S. 64, 68 (1985)).

### b.   Equitable Relief

In Count I of his Amended Complaint, the only equitable relief Mr. Lane seeks is "any and all other relief, both at law and in equity" to which he may be entitled.  (Doc. 11).  In Count II of his Amended Complaint, Mr. Lane seeks "placement in the position in which he would have worked absent the Defendant's retaliatory treatment," "injunctive relief," and "such other legal or equitable relief" to which he may be entitled. (Doc. 11).

Generally, "state officials sued for damages in their official capacity are immune from suit in federal court" unless the plaintiff is seeking "*prospective* equitable relief to end *continuing* violations of federal law" under *Ex parte Young*.  *Pears v. Mobile County*, 645 F. Supp. 2d 1062, 1078, n. 22 (S.D. Ala. 2009); *Ex parte Young*, 209 U.S. 123 (1908).  To obtain relief for an ongoing violation of federal law under *Ex parte Young,* the plaintiff must allege that "a violation of federal law by a state official is ongoing as opposed to . . . violated at one time or over a period of time in the past."  *Summit Medical Associates,* 180 F.3d at 1338 (citing *Ex parte Young*, 478 U.S. at 277-78).

In *Pears*, the court dismissed the plaintiff's § 1983 claims because," the record [was] devoid of evidence of a continuing violation of federal law by defendants; rather, [plaintiff's] requests for reinstatement and other prospective relief [were] hinged exclusively on discrete acts that occurred in 2006 and early 2007, rather than any ongoing, continuing malfeasance today." *Id.* at n. 22.  Like the plaintiff in *Pears,* Mr. Lane requests reinstatement and other generalized

13

equitable relief that is "hinged exclusively" on a "discrete act,"– his termination in 2009.  Mr. Lane does not claim that Dr. Franks is engaging in any ongoing violation of federal law that necessitates the prospective injunctive relief contemplated in *Ex parte Young*.

In *Edelman v. Jordan*, the Supreme Court refused to allow retroactive restitution when it would "to a virtual certainty be paid from state funds, and not from the pockets of individual state officials who were the defendants in the action." 415 U.S. 651, 668 (1974). The Eleventh Circuit has also stated that, "[I]f prospective relief would invade a state's sovereignty as much as an award of money damages would, the action will be barred by the Eleventh Amendment." *Summit Medical Associates,* 180 F.3d at 1337 (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997)).  The Defendants rightfully point out that Mr. Lane's reinstatement would interfere with CACC, an arm of the State, making employment decisions and would require the State to pay Mr. Lane's salary once he was reinstated. The Eleventh Amendment bars this type of prospective relief that implicates a state's sovereignty interests and funds.

Because Mr. Lane's alleged claims for prospective relief do not fall under the *Ex parte Young* exception to Eleventh Amendment immunity, and the prospective relief Mr. Lane seeks significantly implicates Alabama's sovereignty interests and state treasury, the court will DISMISS all claims against Dr. Franks in his official capacity seeking equitable relief.

### 3.    Dr. Franks in his Individual Capacity

The Defendants argue that Dr. Franks is also immune in his individual capacity because he was acting in his official capacity as President of CACC when he terminated Mr. Lane and state officials are immune in their individual capacities when the state is the real party in interest. The Defendants rely on *Harbert Intern., Inc. v. James* for the proposition that "[A] suit is against

14

the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." 157 F.3d 1271, 1277 n. 3 (11th Cir. 1998) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, 101 n.11 (1984)); *see also Alexander v. Chattahoochee Valley Comm. Coll.*, 325 F. Supp. 2d 1274, 1296 (M.D. Ala. 2004) (dismissing claims against the community college president in her individual capacity because they were barred by the Eleventh Amendment).

Mr. Lane's reinstatement would compel Alabama to act through Dr. Franks and would cost the state an amount of money equal to Mr. Lane's salary.  Dr. Franks seems to fit into the framework of a government official who is immune in his individual capacity because the state is the real party in interest in this case. Even if Dr. Franks is not immune under the doctrine of sovereign immunity, however, he is still immune in his individual capacity from suit under the doctrine of qualified immunity.

B.      Qualified Immunity

Defendants argue that even if Dr. Franks is not absolutely immune from suit in his individual capacity under the Eleventh Amendment, he is immune under the doctrine of qualified immunity. Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities unless the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or

one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).  Government officials act within the scope of their discretionary authority if "the actions were (1) 'undertaken pursuant to the performance of [their] duties' and (2) 'within the scope of [their] authority.'" *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1998)). "Exercising judgment . . . in the administration of a department or agency of government" is a recognized discretionary function.  *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

Mr. Lane concedes that Dr. Franks was acting within the scope of his discretionary authority as President of CACC when he terminated Mr. Lane's employment and subsequently did not rescind the termination. Because the Defendants have established that Dr. Franks was acting within his discretionary authority, the burden now shifts to Mr. Lane to show that qualified immunity is inapplicable in this case.  *See Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) ("Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.").

The Supreme Court has articulated a two-part test to determine whether qualified immunity is appropriate.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, the court must ask this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[?]"  *Gonzalez v.*

16

*Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, "[i]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* (citing *Saucier*, 533 U.S. at 201).

"A constitutional right is clearly established if controlling precedent has recognized the right in a 'concrete and factually defined context.'" *Chesser v. Sparks*, 248 F.3d 1117, 1122 (11th Cir. 2001). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993).

The court recognizes that it is commonly known and well-established that a state cannot "discharge a public employee in retaliation for protected speech." *Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir. 1994). A public employee's right to speech, however, is not absolute, and the Eleventh Circuit utilizes the *Pickering* balancing test to determine whether a state actor has retaliated against an employee for protected speech. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11 Cir. 1989); *Pickering v. Board of Education*, 391 U.S. 563 (1968).

First the court must determine whether Mr. Lane "spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006). In *Garcetti*, the Supreme Court identified two factors to be used in determining whether the public employee spoke as a citizen: (1) whether the speech occurred in the workplace, and (2) whether the speech was made as part of the public employee's job duties. *Garcetti,* 547 U.S. at 420-421. The Supreme Court made clear that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes," and that the statements

of public employees retain their official status when "there is no relevant analogue to speech by citizens who are not government employees." *Id.* at 421, 423-24. In determining whether a statement is protected under the First Amendment, the court must "look to the content, form, and context of a given statement, as revealed by the whole record." *Vila v. Padron*, 484 F.3d 1334, 11340 (11th Cir. 2007). Here, Mr. Lane's testimony did not occur in the workplace, but he learned of the information that he testified about while working as Director at C.I.T.Y. Because he learned the information while performing in his official capacity as Director at C.I.T.Y., the speech can still be considered as part of his official job duties and not made as a citizen on a mater of public concern, as the Eleventh Circuit has ruled in similar cases.

In *Abdur-Rahman v. Walker*, the Eleventh Circuit ruled that sewer inspectors' reports were not made as citizens on matters of public concern because they were made pursuant to the inspectors' official job duties:

> [T]he reports of inspectors to their supervisors about sewer overflows they were required to investigate are not protected under the First Amendment. The inspector's reports about sewer overflows concerned information they requested and investigations they performed for the purpose of fulfilling their assigned job duties. The inspectors' reports 'owe their existence' to their official responsibilities and cannot reasonably be divorced from these responsibilities.

567 F.3d 1278, 1283 (11th Cir. 2009) (quoting *Garcetti*, 547 U.S. at 421). Additionally, in *Vila v. Padron,* the Eleventh Circuit ruled that a Community College Vice President's complaints about possible unethical and illegal conduct within the Community College fell "squarely within her official job duties and [were] not protected by the First Amendment." 484 F.3d 1334, 1339 (11th Cir. 2007).

In this case, Mr. Lane investigated Ms. Schmitz's job duties and ultimately terminated her

employment with CACC because it was one of his job duties to hire and fire employees within the C.I.T.Y. Program. He fired Ms. Schmitz in his capacity as Director of C.I.T.Y., and he was subpoenaed to testify as to his investigation and subsequent termination of Ms. Schmitz in his capacity as Director of C.I.T.Y.  Mr. Lane argues that he could not have been called to testify in his official position as C.I.T.Y. Director because he testified in Ms. Schmitz's second trial *after* he was terminated from C.I.T.Y.  The court does not find this argument persuasive because Mr. Lane was employed by C.I.T.Y. when he *learned* the information about which he testified, which is the relevant point in time. The court is persuaded that qualified immunity applies to Dr. Franks' action because Mr. Lane was not speaking as a citizen on a matter of public concern but rather speaking pursuant to his official job duties as Director of C.I.T.Y. The court, however, will also consider the parties' arguments about whether the fact that Mr. Lane testified pursuant to a subpoena establishes that Dr. Franks was acting in contravention to clearly established law when he testified in Ms. Schmitz's criminal case.

The only controlling cases concerning testimony given pursuant to a subpoena are *Martinez v. City of Opa-Locka*, 971 F.2d 708 (11th Cir. 1992) and *Morris v. Crow*, 142 F.3d 1379 (11th Cir. 1998).  The Defendants argue that under *Martinez* and *Crow,* Dr. Franks was not on fair notice that Lane's testimony in his official capacity as Ms. Schmitz's former supervisor and pursuant to a subpoena was protected speech, such that basing Mr. Lane's termination on that testimony would violate the First Amendment. Mr. Lane argues that at the time of his termination *Martinez* conclusively established that a public employee could not be punished in retaliation for testifying pursuant to a subpoena.

In *Martinez*, the City hired the plaintiff as Director of the Purchasing Department. The

City Commission, which had general legislative and policy-making authority, subpoenaed the plaintiff to testify concerning the purchasing practices of the City. At these appearances, the plaintiff testified that the City Manager violated the City's prescribed bid procedures. After making these statements and a similar statement to an investigator from the State Attorney's Office, the City Manager terminated the plaintiff's employment. The plaintiff filed a three count suit in federal court under 42 U.S.C. § 1983 against the City and the City Manager in his individual capacity claiming that she was fired in retaliation for her exercise of free speech. The Court ruled that the plaintiff's speech "clearly affected a matter of public concern" because she provided information concerning the expenditure of public funds and testified before the City's legislative body.  *Martinez*, 971 F.2d at 712. The plaintiff's speech was protected when made pursuant to a subpoena and in front of a municipal body that had general legislative and policy-making authority. *Id.*

In *Morris v. Crow*, however, a deputy sheriff alleged the sheriff fired him in retaliation for deposition testimony he gave under subpoena in a civil suit implicating a fellow deputy in a fatal traffic accident. The Court found that the deputy did not testify under subpoena to "make public comment on sheriff's office policies and procedures [or] the internal workings of the department," but rather in compliance with the subpoena to testify truthfully. *Crow*, 142 F.3d at 1382. The Court affirmed the Sheriff's qualified immunity in the case, stating that, "[t]he mere fact that [the deputy]'s statements were made in the context of a civil deposition cannot transform them into constitutionally protected speech." *Id.* at 1383.

The court notes that the Eleventh Circuit decided *Martinez* in 1992 and *Crow* in 1998; both decisions were rendered before the Supreme Court's decision in *Garcetti* in 2006 and the

Eleventh Circuit's decisions in *Walker* in 2009 and *Vila in 2007*. Thus, the decisions relating to testimony given pursuant to subpoenas do not address whether the public employee's speech was made as part of his official duties and thus not as a citizen on a matter of public concern. Although the plaintiff's testimony pursuant to a subpoena was protected speech in *Martinez*, the mere presence of a subpoena did not defeat the officer's qualified immunity in *Crow*. Despite the plaintiff's contentions, *Martinez* and *Crow* do not create a clear and binding precedent so well-established that Dr. Franks should have known that he was violating Mr. Lane's Constitutional rights by terminating him, if he terminated him because of his testimony in Ms. Schmitz's criminal trial.

The fact intensive nature of First Amendment retaliation cases creates a maze of case law so discrete in its application and wavering in its precedential force that very rarely will the plaintiff be able to prove that "'case law, in factual terms, has . . . staked out a bright line.'" *Chesser v. Sparks,* 248 F.3d 1117, 1123 (2001) (quoting *Post*, 7 F.3d at 1557). The question to ask in qualified immunity cases is not whether "the very action in question has previously been held unlawful;" it is whether "the unlawfulness of the action [was] apparent in the light of pre-existing law." *Williams v. Consol. City of Jacksonville,* 341 F.3d 1261, 2169-70 (11th Cir. 2003) (internal citations omitted). The court finds that a reasonable government official in Dr. Frank's position would not have had reason to believe that the Constitution protected Mr. Lane's testimony made pursuant to a subpoena at Ms. Schmitz's trial because the unlawfulness of his action was not "recognized . . . in a 'concrete and factually defined context.'" *Chesser*, 248 F.3d at 1122 (quoting *Lassiter v. Ala. A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994)). Thus, summary judgment is appropriate in this case.

IV.    CONCLUSION

The Eleventh Amendment bars Mr. Lane's claims against CACC and Dr. Franks in his official capacity as President of CACC.  Even if the Eleventh Amendment does not bar Mr. Lane's claim against Dr. Franks in his individual capacity, which the court finds it does, the court also finds that Mr. Lane's right to free speech under the First Amendment as a testifying witness under subpoena in a criminal trial was not clearly established, as is required under *Saucier*, to defeat Dr. Franks' qualified immunity.  Thus, all of Mr. Lane's claims are barred by the Eleventh Amendment or the doctrine of qualified immunity. For these reasons, the court will GRANT Defendants' Motion for Summary Judgment and DISMISS WITH PREJUDICE all of Mr. Lane's claims against CACC and Dr. Franks. The court will simultaneously enter a separate order to that effect.

DONE and ORDERED this 18th day of October, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE